T.C. Memo. 1998-342


UNITED STATES TAX COURT


KENCO RESTAURANTS, INC., ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.  15949-95, 15950-95    Filed September 24, 1998.
             15951-95, 15952-95.


        Pursuant to sec. 482, I.R.C., R reallocated among
a group of commonly owned corporations certain
management service fees charged by one member of the
group to the other members.
        Held:  Ps have failed to prove that R abused his
discretion by making an arbitrary, capricious, or
unreasonable reallocation.  Held, further, Ps were
negligent in making their initial allocation.


        John D. Steffan, for petitioners.

        Diane D. Helfgott, for respondent.

---

[1]     Cases of the following petitioners are consolidated
herewith:  K-K Restaurants, Inc., docket No. 15950-95; Bryan
Realty, Inc., docket No. 15951-95; Tiffin Avenue Realty Co.,
Inc., docket No. 15952-95.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  These cases have been consolidated for trial, briefing, and opinion.  Respondent has determined deficiencies in income tax and accuracy-related penalties as follows:

| Petitioner | Year | Deficiency | Penalty |
|---|---|---|---|
| Kenco Restaurants, Inc. (Kenco) | 1990 | $36,664 | $7,333 |
| | 1991 | 40,311 | 8,062 |
| | 1992 | 23,068 | 4,614 |
| K-K Restaurants, Inc. (K-K) | 1990 | 35,056 | 7,011 |
| | 1991 | 18,962 | 3,792 |
| | 1992 | 21,304 | 4,261 |
| Tiffin Avenue Realty, Co., Inc. (Tiffin) | 1990 | 4,772 | 954 |
| | 1992 | 4,124 | 825 |
| Bryan Realty, Inc. (Bryan) | 1992 | 174 | 35 |

After concessions, the remaining issues to be determined are:  (1) Whether respondent's reallocations of deductions among petitioners and certain other commonly controlled corporations under section 482 were necessary to clearly reflect the income of such corporations, and (2) whether petitioners are liable for the accuracy-related penalties imposed pursuant to section 6662.

Unless otherwise indicated all section references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Introduction

Some of the facts have been stipulated and are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference. At the time of the filing of the petitions in these cases, the principal places of business of all petitioners were in Ohio.

The Commonly Owned Group

Petitioners are members of a commonly owned group of 14 corporations (the group). Except for one member of the group, BKK Management, Inc. (BKK), each member of the group either owns and operates one or more Taco Bell restaurants or owns the real estate on which another member of the group operates a Taco Bell restaurant. BKK provides management and administrative support services to the other 13 members of the group. During the years at issue, each member of the group was owned in equal shares by George L. Kentris (G. Kentris), Michael N. Kentris (M. Kentris), and Kenneth J. Baerwaldt (Baerwaldt), either individually or together with their spouses. Messrs. G. Kentris, M. Kentris, and Baerwaldt were also the directors and managing officers of each member of the group (collectively, the owner-managers).

BKK Management, Inc.

BKK was established as a "cost company", to provide management and administrative support services to the other members of the group (the purchasing members) at cost. Among the

services BKK provided to the purchasing members were the following:  accounting and administrative services, advertising, coordination and installation of Taco Bell menus, renovations, remodeling and repairs, building and equipment maintenance, insurance coverage, training, inspections, and contracting. BKK's costs, which were passed on to the purchasing members, included payroll-related costs (including salaries, employment taxes, and the cost of health benefits) and incidental costs (including office supplies, telephone charges, and rent).  The payroll-related costs represented the vast majority of BKK's costs in providing the management and administrative services to the purchasing members.  Approximately 85 percent of BKK's payroll-related costs was attributable to the owner-managers. The remaining approximately 15 percent was attributable to support staff.

The owner-managers were employed by BKK to provide services to the purchasing members.  They received salaries and certain other fees from BKK.  They did not receive any other compensation for their services as officers or directors of the members of the group.  Messrs. M. Kentris and Baerwaldt were full-time employees of BKK.  Mr. G. Kentris, an attorney, who maintained an active law practice, worked part-time for BKK.  All three owner-managers, however, received substantially identical salaries.

The owner-managers did not maintain time logs or written documents recording the hours that they spent working on behalf of any individual member of the group.

During the years at issue, in consideration of the services received from BKK, each of the purchasing members paid BKK a fee (the BKK fees). The following table lists the purchasing members and sets forth (1) the BKK fees paid during each of the years in issue and (2) the corresponding percentage that each such fee is of the total BKK fees for each year.

| Members | 1990 | | 1991 | | 1992 | |
|---|---|---|---|---|---|---|
| Kenco* | $313,700 | 43.0% | $413,000 | 42.3% | $389,000 | 33.5% |
| K-K* | 279,650 | 39.0 | 283,500 | 29.0 | 380,600 | 32.9 |
| Tiffin* | 28,000 | 3.9 | 31,000 | 3.2 | 26,000 | 2.2 |
| Bryan* | --- | | --- | | 3,000 | 0.3 |
| GMK, Inc. | 9,100 | 1.0 | 21,700 | 2.2 | 87,200 | 7.5 |
| Perrysburg Restaurants, Inc. | 29,000 | 4.0 | 60,415 | 6.2 | 42,700 | 3.7 |
| Bowling Green Restaurants, Inc. | 30,500 | 4.2 | 82,000 | 8.4 | 112,000 | 9.7 |
| Wapak Restaurants, Inc. | --- | | 29,600 | 3.0 | 52,366 | 4.5 |
| Trenton Avenue Realty, Inc. | 12,000 | 1.7 | 14,500 | 1.5 | 16,100 | 1.4 |
| Allentown Road Realty, Inc. | 2,000 | 0.3 | 8,700 | 0.9 | 11,100 | 1.0 |
| Harding Highway Realty, Inc. | 18,000 | 2.5 | 24,000 | 2.5 | 25,000 | 2.2 |
| Apollo Drive Realty, Inc. | 3,000 | 0.4 | 7,700 | 0.8 | 7,200 | 0.6 |
| Bryan Restaurants, Inc. | --- | | --- | | 6,000 | 0.5 |
| Total | $724,950 | 100% | $976,115 | 100% | $1,158,266 | 100% |

* Petitioners in these consolidated cases

OPINION

I.  Introduction

Petitioners are members of a commonly owned group of 14 corporations (the group), 13 of whom (the purchasing members), during one or more of the years in issue, purchased management services from the 14th, BKK Management, Inc. (BKK).  Each of the purchasing members deducted its payments to BKK for management services (the BKK fees).  In order to clearly reflect the incomes of the purchasing corporations, respondent has reallocated the BKK fees among the purchasing corporations (generally, respondent's reallocation).  Respondent has decreased the share of the BKK fees claimed by each petitioner.  Petitioners argue that respondent's reallocation is arbitrary, capricious, and unreasonable.  We must determine whether respondent abused his discretion in making his reallocation.  We must further determine whether any underpayments of tax are due to negligence or disregard of rules or regulations.

II.  Reallocation of Deductions

A.  Code and Regulations

In pertinent part, section 482 provides:

> In any case of two or more organizations, trades, or businesses * * * owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses.  * * *

In pertinent part, section 1.482-1(b), Income Tax Regs., provides:  "The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer."

In pertinent part, section 1.482-1(a)(6), Income Tax Regs., provides:

> The term "true taxable income" means, * * * the taxable income (or, as the case may be, any item or element affecting taxable income) which would have resulted to the controlled taxpayer, had it in the conduct of its affairs (or, as the case may be, in the particular contract, transaction, arrangement, or other act) dealt with the other member or members of the group at arm's length.  * * *

In pertinent part, section 1.482-2(b)(1), Income Tax Regs., provides:

> Where one member of a group of controlled entities performs marketing, managerial, administrative, technical, or other services for the benefit of * * * another member of the group * * * at a charge which is not equal to an arm's length charge as defined in paragraph (b)(3) of this section, the district director may make appropriate allocations to reflect an arm's length charge for such services.

Paragraph (b)(3) of section 1.482-2, Income Tax Regs., provides:

> Arm's length charge.  For the purpose of this paragraph an arm's length charge for services rendered shall be the amount which was charged or would have been charged for the same or similar services in independent transactions with or between unrelated parties under similar circumstances considering all relevant facts.  However, except in the case of services which are an integral part of the business activity of either the member rendering the services or the member receiving the benefit of the services * * *

the arm's length charge shall be deemed equal to the costs or deductions incurred with respect to such services * * * unless the taxpayer establishes a more appropriate charge * * *

In pertinent part, section 1.482-2(b)(7)(ii)(A), Income Tax Regs., provides:  "Services are an integral part of the business activity of a member of a controlled group where the renderer renders services to one or more related parties as one of its principal activities."

Section 1.482-1(a)(4), Income Tax Regs., provides:  "The term 'controlled taxpayer' means any one of two or more organizations, trades, or businesses owned or controlled directly or indirectly by the same interests."

B.  Burden of Proof

Respondent's authority to make allocations under section 482 is broad.  Bausch & Lomb, Inc. v. Commissioner, 92 T.C. 525, 581-582 (1989), affd. 933 F.2d 1084 (2d Cir. 1991); Edwards v. Commissioner, 67 T.C. 224, 230 (1976); PPG Indus., Inc. v. Commissioner, 55 T.C. 928, 990-991 (1970).  Respondent's section 482 determination must be sustained absent a showing that he has abused his discretion.  Paccar, Inc. v. Commissioner, 85 T.C. 754, 787 (1985), affd. 849 F.2d 393 (9th Cir. 1988).  The determination of whether respondent abused his discretion presents a question of fact, and petitioners bear the burden of proof.  Rule 142(a).  Indeed, in order for us to redetermine a deficiency attributable to section 482, petitioners bear the heavier than normal burden of proving that respondent's section

482 allocation is arbitrary, capricious, or unreasonable. <u>Bausch & Lomb, Inc. v. Commissioner</u>, <u>supra</u>; <u>G.D. Searle & Co. v. Commissioner</u>, 88 T.C. 252, 359 (1987); see also <u>Altama Delta Corp. v. Commissioner</u>, 104 T.C. 424, 456-457 (1995); <u>Seagate Tech. Inc. & Consol. Subs. v. Commissioner</u>, 102 T.C. 149, 163-164 (1994).

Neither the absence of tax avoidance motives, nor the existence of a business purpose, precludes respondent from reallocating costs under section 482 in order to reflect clearly the respective incomes of members of the controlled group. <u>Central Cuba Sugar Co. v. Commissioner</u>, 198 F.2d 214, 215-216 (2d Cir. 1952) (dealing with 26 U.S.C. sec. 45 (I.R.C. 1939), the precursor to section 482), revg. and remanding on this issue, 16 T.C. 882 (1951); <u>Eli Lilly & Co. v. United States</u>, 178 Ct.Cl. 666, 372 F.2d 990, 998-999 (1967); <u>G.D. Searle & Co. v. Commissioner</u>, <u>supra</u> at 359.

C. <u>Common Control</u>

Petitioners are commonly owned corporations, owned in equal shares by the owners either individually or with their respective spouses, and are, thus, "controlled taxpayers" within the meaning of section 482. See sec. 1.482-1(a)(4), Income Tax Regs.

D. <u>Arm's-Length Charges</u>

The parties have stipulated, and we have found, that the primary purpose of BKK is to provide management and administrative support services to the other 13 members of the group. BKK provided such services to the purchasing members, and

all of its costs were charged to the purchasing members as fees for those services. Thus, we find that BKK rendered services to related parties as one of its principal activities. As a consequence, rendering services was an integral part of BKK's business activity within the meaning of section 1.482-2(b)(7)(ii), Income Tax Regs. Because of that, the cost or deductions incurred by BKK with respect to the services rendered by BKK to the purchasing members (and passed through to the purchasing members) is not deemed equal to an arm's-length charge for those services. See sec. 1.482-2(b)(3), Income Tax Regs. Instead, an arm's-length charge is the amount that would have been charged for the same or similar services in independent transactions with or between unrelated parties under similar circumstances considering all the relevant facts (the independent transactions standard). Id.

Before concluding this discussion of arm's-length charges, it is important to note that we are not here concerned with the arm's-length charge for the totality of services provided by BKK to the purchasing members for each year (BKK's total yearly fees), which respondent does not challenge, but rather with the allocation of BKK's total yearly fees among the purchasing members.

E. Reasonableness of Allocation

1. Respondent's Reallocation

Respondent's reallocation is reflected in the statutory notice of deficiency received by each petitioner. Each such

notice contains one or more negative adjustments (depending on the number of years in issue) for "management cost share expenses". Those adjustments are explained in substantially similar language, as follows:

> [I]t is determined the management fee was paid under an agreement which is not at arm's length. Therefore, this expense is reallocated among the controlled corporations under section 482 of the Internal Revenue Code. This action is necessary to clearly reflect the true taxable income of each controlled corporation and to prevent income manipulation. * * *

Respondent called as a witness Diane Camper, a revenue agent for the Internal Revenue Service. Ms. Camper is responsible for calculating the adjustments respecting management cost share expenses set forth in the notices of deficiency. Ms. Camper was questioned on cross-examination about the methodology she used to make those adjustments. She testified that she made those allocations based on the gross sales of the purchasing corporations, making some adjustments with respect to time spent with respect to certain of the purchasing corporations that were merely real estate holding companies.

At trial, respondent called as an expert witness Sharon Moore. Ms. Moore is a certified public accountant and a senior appraiser accredited by the American Society of Appraisers. She is affiliated with Alpha Consulting Alliance (Alpha) and, along with others affiliated with Alpha, prepared a report that was offered as her expert testimony (the report). The report was prepared in response to respondent's request that Alpha opine as to whether BKK's management cost fee allocation represented an

arm's-length price to each of the purchasing corporations.   Ms. Moore was of the opinion that "the management costs allocated by BKK Corporation for managerial and administrative services are not accurately allocated based on value-add [sic] to the operating restaurant entities."   Ms. Moore also reached a conclusion as to a fair allocation of such costs.   Ms. Moore was accepted by the Court as an expert with respect to business valuation, and her report was received into evidence as her expert testimony.

### 2.   Petitioners' Allegations

Petitioners recognize that they must show that respondent abused his discretion:   They must show that respondent's allocations are arbitrary, capricious, or unreasonable.[2]   See, e.g., Bausch & Lomb, Inc. v. Commissioner, 92 T.C. at 582. Ms. Camper testified that she allocated BKK's total yearly fees among the purchasing members based primarily on gross sales, with some adjustments with respect to the realty holding corporations, which did not have any sales (respondent's method).   Although petitioners allege that their allocation (which is based on the

---

[2]   The case law interpreting sec. 482 illustrates that there is some ambiguity as to whether the taxpayer has the burden of proving that (1) the amount of the allocation proposed by the Commissioner is arbitrary, capricious, or unreasonable, or (2) the method or theory upon which the allocation was based is arbitrary, capricious, or unreasonable.   Compare Perkin-Elmer Corp. & Subs. v. Commissioner, T.C. Memo. 1993-414 (theory was arbitrary, and capricious), with Sundstrand Corp. & Subs. v. Commissioner, 96 T.C. 226, 354 (1991) (result was arbitrary and capricious), and Eli Lily & Co. v. United States, 178 Ct. Cl. 666, 676, 372 F.2d 990, 997 (1967) (same).   That ambiguity does not affect resolution of this case.

owner-managers' service hours) is reasonable, they have not directed any of their argument to proving that respondent's method produces an arbitrary, capricious, or unreasonable result, to wit, that gross sales is not indicative of management and administrative services provided. Petitioners do, however, make a collateral argument assaulting respondent's method, alleging that Ms. Camper did not take into account certain unusual events that occurred during the years at issue, which required BKK to provide unusual types and amounts of services to the affected purchasing members.[3] Ms. Camper testified that she considered allocation methodologies based on both hours and gross sales. Although she admitted that the "top" method would have been based on hours or time spent, she was limited by the information available to her. The owner-manager's failure to maintain time logs or other documentation recording the allocation of their time spent among the purchasing members, along with their failure to separately account for the time spent by support staff (whose activities gave rise to 15 percent of payroll-related costs), made it impossible for her to determine the impact of the unusual events on the services provided using an hour-based allocation

---

[3] The unusual events include: (1) A fire at one of Kenco's restaurants that burned the restaurant to the ground on Dec. 7, 1989, and the subsequent construction of a new, larger restaurant, (2) the owners razed Tiffin Realty's only restaurant and rebuilt a new facility in 1990, (3) the owners remodeled Bowling Green's only restaurant and expanded the dining room of K-K's restaurant located on Trenton Ave. in 1991, and (4) Bryan was incorporated on June 3, 1992, and Bryan's restaurant opened in Oct. 1992.

methodology.  Petitioners have, therefore, failed to prove that respondent's method, based as it was on gross sales, did not satisfy the independent transactions standard and, thus, reflect arm's-length charges for purposes of this case.  See supra sec. II.D.  Further, petitioners did not even address the individual allocations resulting from respondent's method beyond arguing that they would be different had Ms. Camper's method weighed the unusual events more heavily.  Finally, since the practice of the group was to separate real estate ownership from restaurant operation, the unusual events in question that involved the destruction or construction of improvements to real property (see supra, note 3), affected the real estate holding companies.[4] Ms. Camper testified that, in allocating management cost share expenses to the real estate holding companies, she took into account not only those members' gross sales (which were very low) but also some measure of the time spent with respect to those members.  Undoubtedly, management time was necessary to deal with the destruction and construction caused by the unusual events and, to that extent, Ms. Camper did take account of the unusual events.  Petitioners have not persuaded us that it was arbitrary, capricious, or unreasonable for Ms. Camper to deal with the real estate holding companies as she did, nor have petitioners

---

[4]    For instance, it was Harding Highway Realty, Inc. and not Kenco, that incurred the loss from the fire, filed the claim, received the proceeds from the insurance company, sold the property and received the proceeds therefrom, and incurred the costs of building the new facility.

proposed a formula for quantifying the value of any additional management and administrative services necessitated by such unusual events. Therefore, petitioners have failed to prove that the allocations resulting from respondent's method do not satisfy the independent transactions standard or reflect arm's-length charges.

Petitioners' principal engagement at trial and on brief was with Ms. Moore's allocation, apparently due to their belief that respondent had abandoned his method in favor of Ms. Moore's. Although the Moore allocation differs from the amounts allowed by respondent in the notices of deficiency, respondent is explicit in stating that he has not abandoned the notice and, we believe, relies on the Moore allocation only to prove a reasonable allocation on the contingency that petitioners succeed in showing the respondent's allocation to be arbitrary, capricious, or unreasonable. Having concluded that petitioners have failed to carry their initial burden, we need not consider petitioners' criticism of Ms. Moores's allocation.

### 3. Conclusion

Petitioners have failed to carry their burden of proving that respondent abused his discretion; i.e., that the allocations resulting from respondent's method were arbitrary, capricious, or unreasonable. The management cost fee allocation determined in petitioners' notices of deficiency is therefore sustained.

III.  Accuracy-Related Penalties

In the case of an underpayment of tax required to be shown on a return, section 6662(a) and (b)(1) impose a penalty in the amount of 20 percent of the portion of the underpayment that is attributable to negligence or intentional disregard of the rules or regulations (hereafter, simply, negligence).  Negligence has been defined as lack of due care or failure to do what a reasonable and prudent person would do under like circumstances. E.g., Hofstetter v. Commissioner, 98 T.C. 695, 704 (1992). Negligence includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return; it also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly. Sec. 1.6662-3(b)(1), Income Tax Regs.

Respondent determined penalties under section 6662(a) and (b)(1), and petitioners assigned error to those determinations. On brief, however, petitioners fail to identify those penalties as an issue in this case.  We assume that petitioners principally rely on our finding no deficiencies in tax to avoid the penalties.  In that tactic, petitioners are not successful.

Respondent's notices of deficiency do not particularize petitioners' negligence.  On brief, respondent explains: "[P]etitioners were negligent in claiming deductions for management expenses that were solely based on petitioners'

ability to assume the cost of such expenses, and that petitioners continued to do so even after they were informed by respondent's agents that the method of determining such costs was arbitrary." That explanation, at least the first clause, is not a model of clarity. We deduce that respondent's principal complaint is that petitioners were negligent in allocating the BKK fees on a basis that did not reflect the relative usage of BKK services by the purchasing members.

Ms. Moore was of the opinion that petitioners' method of allocating the management cost share fee did not satisfy a value added standard. Ms. Moore opined that each restaurant showed profitability consistent with industry averages before the management cost share fee allocation, but not after, concluding that petitioners' allocation distorted the individual store performances and did not clearly reflect the economic income of those locations.

Petitioners claim: "The representations of hours spent by the owner/managers is highly reliable and was neither rebutted nor impeached at trial." We assume that petitioners' claim is that the representation of hours spent by the owner-managers is reliable in the sense that it accurately reflects the hours spent with respect to each purchasing member. Petitioners state: "[T]he time allocation was based on historical experience; was evaluated on a regular, on-going (almost daily) basis by the owner/managers; was evaluated and adjusted at midyear based on

actual experience; and was recorded in contemporaneous records kept in computer spreadsheets." We, thus, assume that petitioners' implicit defense to the claim of negligence rests on the accuracy of their time allocations. Petitioners bear the burden of proof. Rule 142(a). Petitioners have not carried that burden.

Petitioners make much of the unusual events, which occurred during the years at issue, and which, petitioners claim, required BKK to dedicate unusual amounts of time to certain of the purchasing corporations. Those events, however, do not account for petitioners' allocations, and the record does not support petitioners' contentions that the owner-managers spent most of their time working on behalf of K-K and Kenco. Although no special projects required additional managerial attention for Kenco's restaurants in 1991, unlike in 1990, the management cost fee allocated to Kenco for 1991 was higher in absolute terms, and only slightly lower in relative terms, than the fee BKK charged to Kenco in 1990. Although petitioners do not claim that K-K required unusual management attention in 1992 as compared to 1991, its allocated fee was higher in both absolute and relative terms in 1992 than in 1991. It is telling that, between 1990 and 1992, GMK's management cost fee allocation increased more than 900 percent. That percentage increase substantially exceeds the increases in the management cost fee allocated to the other members of the commonly controlled group. In relative terms,

GMK's share of the total BKK management cost fee allocation increased by a factor of seven. During that period, facts stipulated by the parties show that GMK's gross receipts increased substantially as well. During that period, there were no unusual events or other requirements of GMK that justified a substantial increase in management services required in 1991 and 1992 as compared to 1990.

Additionally, Perrysburg, which allegedly required minimal management services, was charged $29,000 in 1990, $60,415 in 1991, and $42,700 in 1992. Petitioners did not provide any explanation, in terms of services required by Perrysburg from year to year, that would account for those differences.

Finally, it defies explanation how Wapak was not allocated any of BKK's management costs in 1990. Petitioners allege that BKK's management costs were allocated using an allocation methodology predicated on the number of hours that the owners spent at or on behalf of each of the commonly controlled corporations. Wapak was incorporated and operating a Taco Bell restaurant in 1990. We suspect that Wapak's insufficient cash-flow was the determinant factor in BKK's management's decision not to allocate Wapak a management cost fee in 1990.

Petitioners claim that contemporaneous records of time allocations "were actually created, maintained and used in making the Petitioners' allocations." Those records, petitioners claim, were inadvertently destroyed. The only evidence of

contemporaneous time records was Ms. Borsani's and Mr. G. Kentris' testimony that Mr. G. Kentris' allocations of the owner-manager's hours for the upcoming year were recorded and served as the basis for allocating the BKK fees.  Such forecasts, even if recorded, merely frame the problem, the accuracy of petitioners' estimates; the recording of estimates does not make them any more or less accurate.

Petitioners have failed to persuade us that the owner-managers' time allocations accurately reflected the hours spent by them with respect to each purchasing member.  A close examination of petitioners' "unusual events" argument, along with a consideration of the allocations to Perrysburg and Wapak, convinces us that petitioners' allocations were, at best, what petitioners' counsel characterized them as during his examination of Mr. G. Kentris:  a "guesstimation based on conversations between [sic] the [owner-managers]".  Petitioners have failed to prove that they were not negligent in allocating the BKK fees according to petitioners' ability to "assume" the cost of such expenses.  Respondent's determination of a section 6662 penalty is therefore sustained.

Decisions will be entered

for respondent.