failure to make a reasonable attempt to comply with the provisions of this title . . . ."  I.R.C. § 6662(c).  It has also been defined as a "lack of due care or a failure to do what a reasonable and prudent person would do under the circumstances."  *Hofstetter v. Commissioner,* 98 T.C. 695, 704 (1992).  We find and conclude that Petitioners allocated BKK's management fees on the ability of each Group member to pay.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0057P (6th Cir.)
File Name:  00a0057p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KENCO RESTAURANTS, INC. (98-2416); K-K RESTAURANTS, INC. (98-2417); TIFFIN AVENUE REALTY COMPANY, INC. (98-2418); BRYAN REALTY, INC. (98-2420),
        *Petitioners-Appellants,*

        *v.*

COMMISSIONER OF INTERNAL REVENUE,
        *Respondent-Appellee.*

Nos. 98-2416/
2417/2418/2420

On Appeal from the United States Tax Court.
Nos. 95-15949; 95-15950; 95-15951; 95-15952

Argued:  December 10, 1999

Decided and Filed:  February 16, 2000

1

Before:  BOGGS and SUHRHEINRICH, Çircuit Judges;
POLSTER, District Judge.

───────────────

**COUNSEL**

───────────────

**ARGUED:** John D. Steffan, STEFFAN & ASSOCIATES, Fairfax, Virginia, for Appellants.  Charles F. Marshall, U.S. DEPARTMENT OF JUSTICE, APPELLATE SECTION TAX DIVISION, Washington, D.C., for Appellee. **ON BRIEF:** John D. Steffan, STEFFAN & ASSOCIATES, Fairfax, Virginia, for Appellants. Charles F. Marshall, Teresa E. McLaughlin, U.S. DEPARTMENT OF JUSTICE, APPELLATE SECTION TAX DIVISION, Washington, D.C., for Appellee.

───────────────

**OPINION**

───────────────

SUHRHEINRICH, Circuit Judge.  The Commissioner of the Internal Revenue Service ("Commissioner") sent Petitioners notices of deficiency that reallocated fees Petitioners paid for management and administrative services. The notices of deficiency also imposed accuracy-related penalties.  Petitioners filed separate petitions in the United States Tax Court seeking a redetermination of the deficiencies and accuracy-related penalties.

The tax court sustained the reallocations and penalties because Petitioners failed to overcome the presumption of correctness afforded to the notices of deficiency.  Petitioners appeal.  We **AFFIRM.**

───────────────

[*]    The Honorable Dan A. Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

so did its fees.[5]  GMK's fees increased more than 900% between 1990 and 1992, and its share of the total fees increased by a factor of seven.  However, no evidence was presented that there was a corresponding increase in Owner hours.  In 1990, Kenco required special attention to rebuild the restaurant.  Yet, in 1991, the fee allocated to it was higher than 1990.  There is no claim that K-K required special attention in 1992, but its fee was higher in 1992 than in 1991. Perrysburg was charged $29,000 in 1990, $60,415 in 1991, and $42,700 in 1992, but Petitioners provided no explanation, in terms of services, that would account for these differences.

The third issue we address is whether Petitioners are liable, under § 6662(a) of the Internal Revenue Code, for accuracy-related penalties due to their negligence.  Petitioners contend that the facts do not support the imposition of negligence penalties because Petitioners never made adjustments based upon the ability or inability of a Group member to pay. However, the Commissioner contends that Petitioners allocated fees based on each Group member's ability to pay.

We review an imposition of § 6662(a) "negligence" penalties for clear error.  *See Leuhsler v. Commissioner,* 963 F.2d 907, 910 (6th Cir. 1992); *see also Sacks v. Commissioner,* 82 F.3d 918, 920 (9th Cir. 1996). "Commissioner's assessment of a negligence penalty is presumptively correct, and the taxpayer has the burden of proving that an underpayment was not due to his negligence . . . ." *Leuhsler*, 963 F.2d at 910.

If there is an underpayment of tax on a return, a penalty in the amount of twenty percent of the underpayment is imposed.  *See* I.R.C. § 6662(a).  This applies to the portion of the underpayment that is attributable to negligence.  *See* I.R.C. § 6662(b)(1).  "Negligence" is defined to include "any

───────────────

[5]The Tax Court suspected "that Wapak's insufficient cash-flow was the determinant factor in BKK's management decision not to allocate Wapak a management fee in 1990."  We agree.

Petitioners must show that their own allocations reflect an arm's-length charge. *See DHL Corp. & Subs. v. Commissioner,* 76 T.C.M. (CCH) 1122, 1145 (1998); *see also* Treas. Reg. § 1.482-1(b). This is accomplished by providing evidence of similar transactions between uncontrolled taxpayers. *See Lufkin Foundry & Machine Co.,* 468 F.2d at 808; *see also* Treas. Reg. § 1.482-2(b)(3).

For this first burden, the Commissioner is not required to support the notice of deficiency with proof because courts generally do not examine the underlying motives or policy of the Commissioner's determination. *See Pasternak v. Commissioner*, 990 F.2d 893, 898 (6th Cir. 1993). Also, when determining whether the Commissioner's reallocation is reasonable, courts focus on the reasonableness of the result and not the details of the methodology employed. *See Seagate Tech., Inc. & Consol. Subs. v. Commissioner,* 102 T.C. 149, 164 (1994); *see also Bausch & Lomb, Inc. v. Commissioner,* 92 T.C. 525, 582 (1989).

Under the second burden, which only arises after Petitioners have satisfied the first burden, Petitioners "still have the burden of proving that their own allocation satisfies the arm's length standard." *Inverworld, Inc. v. Commissioner,* 71 T.C.M. (CCH) 3231, 3237-62 (1996); *see also Achiro v. Commissioner,* 77 T.C. 881, 900 (1981). If Petitioners fail to carry this burden, the tax court must determine a proper allocation based on the record. *See Inverworld, Inc.,* 71 T.C.M. (CCH) at 3237-62 (citing *Eli Lilly 7 Co,* 856 F.2d at 860).

We conclude that Petitioners' allocations are not an arm's-length charge because Petitioners provide no evidence of an independent transaction between unrelated parties in similar circumstances. Also, the facts support our conclusion that Petitioners were not dealing at arm's length but were, instead, allocating their costs based on an ability to pay. Petitioners charged Wapak, a Restaurant Corporation, no management fee in 1990, but when its income increased in 1991 and 1992,

## I.

Petitioners-Appellants, Kenco Restaurants, Inc. ("Kenco"); K-K Restaurants, Inc. ("K-K"); Tiffin Avenue Realty Co., Inc. ("Tiffin"); and Bryan Realty, Inc. ("Bryan") (collectively "Petitioners"), are members of a commonly owned group of fourteen corporations (collectively "Group"). During the years 1990 through 1992, George Kentris ("G. Kentris"), Michael Kentris ("M. Kentris"), and Kenneth Baerwaldt ("Baerwaldt"), either individually or with their wives (collectively "Owners"), owned equal shares of the Group.

Of the fourteen Group members, thirteen either own and operate one or more Taco Bell restaurants ("Restaurant Corporations") or own the real estate ("Realty Corporation") on which another member of the Group operates a Taco Bell restaurant. The following is a chart identifying the thirteen Restaurant and Realty Corporations:

| Restaurant Corporations | Location | Realty Corporations |
|---|---|---|
| K-K | Findlay, OH | Tiffin |
| K-K | Findlay, OH | Trenton Ave. Realty |
| Kenco | Lima, OH | Harding Highway Realty |
| Kenco | Lima, OH | Allentown Road Realty |
| Bowling Green | Bowling Green, OH | Bowling Green |
| GMK | Defiance, OH | *unrelated corporation* |
| Perrysburg | Perrysburg, OH | Perrysburg |
| Wapak | Wapakoneta, OH | Apollo Drive Realty |
| Bryan Rest. | Bryan, OH | Bryan |

The fourteenth Group member, BKK Management, Inc. ("BKK"), neither owns a Restaurant Corporation nor owns a Realty Corporation. Instead, BKK provides management and administrative services to the thirteen Group members and bills each Group member for these services. These services are not in dispute and, according to the tax court's opinion, include "accounting and administrative services, advertising, coordination and installation of Taco Bell menus, renovations, remodeling and repairs, building and equipment

maintenance, insurance coverage, training, inspections, and contracting." *Kenco Restaurants, Inc. v. Commissioner,* 76 T.C.M. (CCH) 512, 513 (1998). The services are performed by Owners and BKK's support staff, and BKK pays their salaries. Baerwaldt and M. Kentris provide the operational management of the restaurants, and G. Kentris, an attorney, works half as many hours as the former two and is responsible for the Group's administrative and legal needs, which include payroll, contracts, finances, and legal matters.

All costs that BKK incurs for providing these services are allocated to Group members as a "management cost share" fee. These fees have two categories: *payroll related* (salaries, employment taxes, and health benefits) and *incidental* (office supplies, telephone charges, and rent). Approximately 85 percent of BKK's payroll related costs are attributable to Owners, and approximately 15 percent are attributable to the support staff.

Petitioners contend that BKK's payroll related costs were allocated according to the number of hours each Owner spent with each Group member. For an upcoming year, the Owners projected the hours they would spend with each Group member based on the hours they spent the previous year. Then, they adjusted their projections for upcoming projects and reevaluated them at midyear. However, the Owners did not maintain time logs or written documents recording their actual hours. Petitioners further contend that BKK allocated its incidental costs to Group members based on their consumption.

The fees that Group members paid to BKK are reflected in the following chart. To the right of each fee is the percentage that the fee represents of BKK's total annual fees.

Treas. Reg. § 1.482-2(b)(7)(ii)(a).

We conclude that BKK's performance of services for other Group members is an "integral part" of its business activity and that an arm's-length charge is equal to "the amount which was charged or would have been charged" for same or similar services "in independent transactions with or between unrelated parties under similar circumstances." Treas. Reg. § 1.482-2(b)(3). We reach this conclusion because BKK is a member of a controlled group and renders services as its principal activity.

The Group members are members of a "controlled group," as used in Treasury Regulation § 1.482-2(b)(7)(ii), because each Group member is a "controlled taxpayer." "Controlled taxpayer" is defined as "any one of two or more organizations, trades, or businesses owned or controlled directly or indirectly by the same interests." Treas. Reg. § 1.482-1(a)(4). In the instant case, Petitioners are controlled taxpayers because it is undisputed that they are commonly owned corporations and are owned equally by Owners. Also, BKK renders services to Group members as its principal activity because the parties have stipulated that the primary purpose of BKK is to provide services to Group members. Thus, both the "25 percent test" and the "facts and circumstances test" of Treasury Regulation § 1.482-2(b)(7)(ii) are satisfied.

Now that we have defined an arm's-length charge, we must next determine whether Petitioners have overcome two burdens of proof. Under the first burden, Petitioners must prove that the Commissioner's reallocations are wrong, because the notices of deficiency have a presumption of correctness. *See Welch v. Helvering*, 290 U.S. 111, 115 (1933). This presumption is overcome if Petitioners prove that the reallocations contained in the notices of deficiency are arbitrary, capricious, or unreasonable. *See Spicer Theatre Inc.*, 346 F.2d at 706; *see also Eli Lilly & Co.* 856 F.2d at 860. To prove arbitrary, capricious, or unreasonable,

is "the amount which was charged or would have been charged for the same or similar services in independent transactions with or between unrelated parties under similar circumstances considering all relevant facts." Treas. Reg. § 1.482-2(b)(3).

Of the four situations that the regulations consider an "integral part of the business activity,"[3] the most applicable to the instant facts is Treasury Regulation 1.482-2(b)(7)(ii). In this section, "[s]ervices are an integral part of the business activity of a member of a controlled group where the renderer renders services to one or more related parties as one of its principal activities." Treas. Reg. § 1.482-2(b)(7)(ii). Services are considered "principal activities" if the following two tests are satisfied. First, the renderer's cost of services[4] "attributable to the rendition of services for the taxable year to related parties" must exceed "25 percent of the total costs or deductions of the renderer for the taxable year [25 percent test]." Treas. Reg. § 1.482-2(b)(7)(ii)(a). Second, the facts and circumstances determine whether the rendition of services to related parties is one of the principal activities of the renderer ("facts and circumstances test"). *See* Treas. Reg. § 1.482-2(b)(7)(ii)(a). The regulations consider six factors:

the time devoted to the rendition of the services, the relative cost of the services, the regularity with which the services are rendered, the amount of capital investment, the risk of loss involved, and whether the services are in the nature of supporting services or independent of the other activities of the renderer.

---

[3]Subdivisions (i) through (iv) describe those situations that are considered an "integral part of the business activity." *See* Treas. Reg. §§ 1.482-2(b)(7)(i) through (iv).

[4]Cost of services includes "all costs or deductions directly or indirectly related to the rendition of such services." Treas. Reg. § 1.482-2(b)(7)(ii)(b).

**Restaurant Corporations**

| | | 1990 | 1991 | 1992 |
|---|---|---|---|---|
| **Kenco**[**] | FEE / % | 313,700.00/43.0% | 413,000.00/42.3% | 389,000.00/33.5% |
| **K-K**[**] | FEE / % | 279,650.00/39% | 283,500.00/29% | 380,600.00/32.9% |
| **GMK** | FEE / % | 9,100.00/1.0% | 21,700.00/2.2% | 87,200.00/7.5% |
| **Perrysburg** | FEE / % | 29,000.00/4.0% | 60,415.00/6.2% | 42,700.00/3.7% |
| **Bowling Green** | FEE / % | 30,500.00/4.2% | 82,000.00/8.4% | 112,000.00/9.7% |
| **Wapak** | FEE / % | 0.00/0.0% | 29,600.00/3.0% | 52,366.00/4.5% |
| **Bryan Rest.** | FEE / % | --------- | --------- | 6,000.00/0.5% |

**Realty Corporations**

| | | 1990 | 1991 | 1992 |
|---|---|---|---|---|
| **Tiffin**[**] | FEE / % | 28,000.00/3.9% | 31,000.00/3.2% | 26,000.00/2.2% |
| **Trenton** | FEE / % | 12,000.00/1.7% | 14,500.00/1.5% | 16,100.00/1.4% |
| **Allentown** | FEE / % | 2,000.00/0.3% | 8,700.00/0.9% | 11,100.00/1.0% |
| **Harding Highway** | FEE / % | 18,000.00/2.5% | 24,000.00/2.5% | 25,000.00/2.2% |
| **Apollo** | FEE / % | 3,000.00/0.4% | 7,700.00/0.8% | 7,200.00/0.6% |
| **Bryan**[**] | FEE / % | --------- | --------- | 3,000.00/0.3% |

After an audit, IRS Agent Camper ("Camper") calculated the reallocations of BKK's management fees to reflect each Group member's yearly gross sales.[1] These reallocations decreased the share of BKK fees claimed by each Petitioner and thus decreased each Petitioner's deductions. Consequently, the lowered deductions increased each Petitioner's taxable income and created a disparity between

---

[**]Petitioners on appeal.

[1]Camper testified that she used the gross sales method because Petitioners provided no actual time logs or any other information from which Camper could calculate the actual hours Owners spent with each Group member.

the taxable income as represented by Petitioners and the taxable income as represented by the Commissioner's reallocations.    The notices of deficiency that the Commissioner mailed separately to each Petitioner on June 13, 1995, reflect this disparity.  The deficiencies and their accuracy-related penalties (20 percent) are illustrated in the following chart:

| Petitioners | Year | Deficiency | Penalty | Total |
|---|---|---|---|---|
| Kenco | 1990 | $36,664.00 | $7,333.00 | $43,997.00 |
| Kenco | 1991 | 23,068.00 | 4,614.00 | 27,682.00 |
| K-K | 1990 | 35,056.00 | 7,011.00 | 42,067.00 |
| K-K | 1991 | 18,962.00 | 3,792.00 | 22,754.00 |
| K-K | 1992 | 21,304.00 | 4,261.00 | 25,566.00 |
| Tiffin | 1990 | 4,772.00 | 954.00 | 5,726.00 |
| Tiffin | 1992 | 4,124.00 | 825.00 | 4,949.00 |
| Bryan | 1992 | 174.00 | 35.00 | 209.00 |
| TOTAL | | $184,435.00 | $36,887.00 | $221,323.00 |

On August 18, 1995, Petitioners filed separate petitions in the United States Tax Court for a redetermination of the deficiencies and accuracy-related penalties.  These petitions were consolidated at trial.

At trial, the Commissioner retained Sharon Moore ("Moore"), a business valuation expert with Alpha Consulting Alliance, to decide whether BKK's fee allocations were consistent with an arm's-length transaction.    Moore determined that Petitioners' allocations were not arm's length and devised her own time-based allocations.  To calculate these time-based allocations, Moore used the hours that each Owner and BKK employee spent in performing services for each Group member, which Moore obtained through interviews with Owners and BKK employees, rather than

order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses . . . .

I.R.C. § 482[2].

The "purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer . . . ." *Commissioner v. First Security Bank of Utah,* 405 U.S. 394, 400 (1972).  If an arrangement between related parties differs from those reached in an uncontrolled, arm's-length dealing, the Commissioner may reallocate under section 482.  *See Lufkin Foundry and Machine Co. v. Commissioner,* 468 F.2d 805, 807 n.2 (5th Cir. 1972) (citing *Spicer Theatre,* 346 F.2d at 706).  This authority includes reallocating charges among controlled corporations for "marketing, managerial, administrative, technical, or other services" that do not represent an arm's-length charge.  *See* Treas. Reg. § 1.482-2(b)(1).

Whether the notices of deficiency are arbitrary, capricious, or unreasonable depends, in part, on whether the charges were arm's length.  If the charges were equivalent to charges made at arm's length, then Petitioners have satisfied their burden of proving that the notices of deficiency are arbitrary, capricious, or unreasonable.  The regulations of section 482 govern the definition of an arm's-length charge.

If BKK's services are not an "integral part of the business activity," then an arm's-length charge is generally equal to the costs or deductions incurred in rendering such services.  *See* Treas. Reg. § 1.482-2(b)(3).  However, if BKK's services are an "integral part of the business activity," then the costs or deductions incurred are not an arm's-length charge.  *See* Treas. Reg. § 1.482-2(b)(7).  Rather, an arm's-length charge

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code and its Regulations that are in effect for the taxable years in issue.

deficiency are arbitrary, capricious, or unreasonable. Because deficiency notices have a presumption of correctness, Petitioners have the burden of overcoming this presumption by proving that their initial allocations were arm's length.

Petitioners contend that the Commissioner's reallocation method is arbitrary, capricious, or unreasonable for the following three reasons. First, the Commissioner's methodology ignores the special situations that justified Petitioners' initial allocations. Second, Petitioners contend that their fee allocation is reasonable and arm's length because it represents the actual time spent on managing and operating each Group member. Petitioners further argue that these records were in fact created and monitored even though they were inadvertently destroyed. Third, Moore, the Commissioner's expert, conceded that Petitioners' method of allocating time was reasonable because Moore's method is identical and differs only as to hours.

The Commissioner contends that Petitioners have failed to show that the reallocations contained in the notice of deficiency are arbitrary, capricious, or unreasonable. In the alternative, the Commissioner contends that assuming we find the notices of deficiency arbitrary, capricious, or unreasonable, then Moore's time-based allocations represent an arm's-length charge. For this alternative contention, Commissioner asserts that Moore's allocations more properly reflect value added to each Group member.

Section 482 of the Internal Revenue Code and its regulations govern the instant case:

> In any case of two or more organizations, trades, or businesses . . . owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in

adopting Petitioners' method of using only Owner hours. Moore included the projected hours of a district manager, a maintenance man, and BKK's in-house accountant ("Borsani"). In contrast to Petitioners' allocations, Moore weighed Owner and employee hours equally because Moore found that both Owners and employees performed similar operational tasks. Moore then converted the total hours allocated to each Group member into a corresponding fee allocation and concluded that her time-based allocations were more consistent with an arm's-length charge than were Petitioners' allocations.

However, Moore's allocations pertained only to the six Restaurant Corporations. Moore neither addressed any fees attributable to the Realty Corporations nor allocated any fees to Bryan Restaurant, Inc., which was created in 1992.

At trial, Petitioners disputed Moore's time-based allocations because Moore never considered special circumstances that varied the time that Owners dedicated to particular Group members. Specifically, these special events include a fire that demolished a Kenco restaurant in 1990, a scrape and rebuild of a K-K restaurant in 1990, a unique employment problem in 1990 (i.e., civil rights commission case filed by former employee), a worker's compensation claim in 1990, additions and remodeling of a K-K restaurant in 1991, land acquisitions and zoning litigation, dramatic decreases in sales caused by rumors of intentionally tainted food in 1992, and the development and opening of the new Bryan restaurant in 1992.

Petitioners also dispute Moore's time-based allocations because Moore included hours of modestly compensated, nonowner employees. Additionally, Petitioners dispute Moore's treatment of Owner's hours as equal to maintenance workers' hours. Moreover, Petitioners dispute Moore's inclusion of 2,000 hours for Borsani in 1992 because Borsani worked at BKK for only one month in 1992.

The tax court ruled in favor of the Commissioner and found that Petitioners failed to prove that the reallocations in the notice of deficiency, based upon gross sales, were arbitrary, capricious, or unreasonable. The tax court also sustained the Commissioner's imposition of accuracy-related penalties.

## II.

We review factual findings of the tax court for clear error and legal questions *de novo*. *See Hoover v. Commissioner,* 102 F.3d 842, 844 (6th Cir. 1996) (citing *Conti v. Commissioner,* 39 F.3d 658, 662 (6th Cir. 1994)). We review mixed questions of law and fact under the "clearly erroneous" standard. *See Eli Lilly & Co. v. Commissioner,* 856 F.2d 855, 860-61 (7th Cir. 1988) (citing *Standard Office Bldg. Corp. v. United States*, 819 F.2d 1371, 1374 (7th Cir. 1987)). Whether the Commissioner abused or exceeded his discretion in determining deficiencies against a taxpayer is a question of fact. *See Spicer Theatre, Inc. v. Commissioner,* 346 F.2d 704, 706 (6th Cir. 1965); *see also American Terrazzo Strip Co., Inc. v. Commissioner,* 56 T.C. 961, 971 (1971).

The first issue we address is whether the Commissioner abandoned the notice of deficiency. Petitioners contend that the Commissioner abandoned the allocations contained in the notice of deficiency at trial and instead relied upon Moore's reallocations. Also, Petitioners contend that the Commissioner has to establish the reasonableness of his adjustments because the burden of proof shifted when he abandoned the original allocations.

The Commissioner, however, contends that he never abandoned the notice of deficiency and that the purpose of Moore's testimony was merely to provide a reasonable allocation in the event Petitioners were successful in proving that the allocations contained in the notice of deficiency were arbitrary, capricious, or unreasonable.

Under current law, the Commissioner may rely on alternative theories supported by a different methodology than

that used in the notice of deficiency. This reliance does not necessarily place the burden on the Commissioner or render the notice of deficiency arbitrary, capricious, or unreasonable. *See Altama Delta Corp. v. Commissioner*, 104 T.C. 424, 458 (1995) (citing *Sundstrand Corp. v. Commissioner*, 96 T.C. 226, 354-355 (1991)).

However, if the Commissioner abandons the notice of deficiency, then the notice of deficiency is no longer presumed correct, and all that remains is for Petitioners to show that the transaction was conducted at arm's length. *See DHL Corp. v. Commissioner*, 76 T.C.M. (CCH) 1122, 1144 (1998).

In the instant case, the tax court found that the Commissioner had not abandoned the notices of deficiency:

> "Although the Moore allocation differs from the amounts allowed by respondent in the notices of deficiency, respondent is explicit in stating that he has not abandoned the notice and, we believe, relies on the Moore allocation only to prove a reasonable allocation on the contingency that petitioners succeed in showing the respondent's allocation to be arbitrary, capricious, or unreasonable."

*Kenco Restaurants, Inc. v. Commissioner,* 76 T.C.M. (CCH) 512, 517 (1998).

Upon our review of the record, we agree with the tax court and find that the Commissioner did not abandon the notices of deficiency. The record does not support that either the Commissioner or Moore rejected Camper's method in favor of the time-based method. Also, as shown below in the second issue, the Commissioner had no reason to establish an arm's-length charge other than as a contingency argument in case Petitioners overcame the initial presumption.

The second issue we address is whether Petitioners have shown that the reallocations contained in the notice of